UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

IN RE:

SHANNON LEE ROSS,                                    Case No: 05-12252

       Debtor.

SHANNON LEE ROSS,

       Plaintiff,

v.                                                   Adv. No.: 05-01149

UNITED STATES DEPARTMENT OF EDUCATION
and EDUCATIONAL CREDIT MANAGEMENT
CORPORATION,

       Defendants.

**ORDER DISCHARGING PLAINTIFF'S STUDENT LOAN DEBTS**

James M. Orr, Jr., Attorney for Debtor, Mobile, AL
W. McCollum Halcomb, Attorney for Educational Credit Management Corporation, Mobile, AL
Eugene A. Seidel, Attorney for United States Department of Education, Mobile, AL

This matter came before the Court on Shannon Lee Ross's complaint to determine the dischargeability of student loans. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court has authority to enter a final order. For the reasons indicated below, the Court is discharging the debtor's student loan debts.

**FACTS**

Shannon Lee Ross, the 42-year-old debtor, requested a student loan in the amount of $2,625 on or about October 1, 1987, and also on or about September 29, 1992. Both loans were approved and disbursed to the debtor through a United States Department of Education program

("DOE loan"). The debtor also executed a Promissory Note in the amount of $6,625 on or about

October 21, 1994 ("ECMC loan"). This loan was disbursed to the debtor on or about February

20, 1995. At the time, United Student Aid Funds, Inc. was the guarantor of the loan; however,

this loan was transferred to Educational Credit Management Corporation ("ECMC") on or about

October 14, 2005. In his response to interrogatories, the debtor listed that he attended Richland

Community College in Decatur, Illinois, in the 1980s and DeVry in Kansas City, Missouri, in

"1992, 93 or thereabout". He never obtained a degree from either school.

In 1994, Mr. Ross was diagnosed with coronary artery disease. Mr. Ross testified that in

that same year while he was attending DeVry, he fell down hard on his head and cracked his

spine. From that point on, his physical health began deteriorating. In his testimony and response

to interrogatories, Mr. Ross listed that he currently has short-term memory loss[1], scoliosis c5-c6

and L4-L5, vasoconstricted heart arteries, a spinal fusion to L4-L5, and spinal arthritis. He has

also had 4 heart attacks, broken his back 3 times, and has a birth defect in the nature of no

pectoral muscles.

Sometime in 1996, the debtor contacted a law firm to help him file a disability claim with

the Social Security Administration ("SSA"). The SSA declared Mr. Ross disabled and eligible

for social security disability benefits. According to Mr. Ross, the SSA follows up with him every

four years to reevaluate his disability and ensure that he is still eligible for these benefits. Mr.

Ross testified that the SSA has conducted 2 of these follow-ups and has twice concluded that his

disability is ongoing. Currently, the debtor receives $923.50 gross every month from social

---

[1]Mr. Ross testified that he has long-term memory loss at this Court's September 19
hearing.

security. However, $88.50 is deducted for Medicare, leaving the debtor with a net monthly income of $835.

The debtor is separated from his wife and has two daughters, who are 20 and 12 years old as of February 17, 2006. He gets no money or help from his wife or his two daughters. He lives in an apartment by himself at a monthly rent of $550. The debtor's brother testified that he lives on the same street as the debtor. The debtor's primary expenses include necessities, such as food and utilities. Also, Mr. Ross testified that he must spend approximately $200 a month on medication because of his medical problems. Mr. Ross and his brother also testified that the debtor cannot afford to buy all his medicine some months due to his limited income. Mr. Ross testified that because of his inability to pay all his expenses, his brother provides him with approximately $200 per month. However, the debtor's brother testified that he rarely gives the debtor any money, much less a set amount of money every month; instead, he testified that if the debtor needs anything bought or paid for, he usually buys or pays for it if he can afford the added expense that particular month. When asked about the last time he provided assistance to the debtor at this Court's September 19 hearing, the debtor's brother testified that he bought some milk and bread for him several weeks before the trial.

In his answers to interrogatories, the debtor responded that he has not worked since 1995. He stated that he has "tried on several occasions in [the] past to work for my brother but [I] was unable to sustain physical effort and unable to remember job instructions." His brother works as a floor mechanic, which involves stripping and laying carpet. The debtor's brother testified that he will not allow his brother to work for him because the debtor is forgetful and because the job entails a lot of bending and carrying, which may aggravate his brother's back problems. The

3

brother testified that Mr. Ross's disabilities hinder the debtor's ability to get around; sometimes cause him to get out of breath just from standing up; and cause him to experience dizzy spells. Besides the debtor's attempts to work with his brother, the debtor stated that he has not attempted to find other employment because he is disabled.

The debtor filed a Chapter 7 voluntary petition on April 19, 2005. The case was closed on July 25, 2005, and the debtor received his discharge. On July 28, 2005, the debtor filed a motion to reopen his case "in order to file an Adversary Proceeding to determine the dischargeability of Student Loan debts." The Court entered an order granting the debtor's motion on August 18, 2005.

According to a letter sent by the United States Department of Education to the debtor on October 25, 2005, the debtor defaulted on his DOE loan on June 11, 1996. The letter stated that the debtor's total indebtedness, including interest, was $9,692.22, with interest accruing at a rate of $1.36 per day. The letter also noted that the Department of Education had "received a total of $1,095.00 in payments from all sources, including Treasury Department offsets, if any." Mr. Ross testified that some of his income tax refunds were held by the IRS and applied to his student loan debt. Mr. Ross also testified that he tried to make payments a couple of years ago but stopped because he could not afford it.

On September 20, 2005, the debtor filed a complaint stating that he was "indebted to the . . . U.S. Department of Education in the amount of approximately $18,000 and government guaranteed or direct student loans."[2] The debtor claimed that not "[e]xcepting this debt from discharge will impose undue hardship upon this debtor." On October 7, 2005, ECMC filed an

---

[2]It appears that the Debtor was referring to the ECMC loan in his complaint.

4

answer, claiming that "ECMC is the current holder of the educational loans on which this action is based." On October 25, 2005, the Department of Education filed an answer claiming that the debt owed to it was only in the amount of $9,692.22.[3] The Department of Education also noted that "there are two other outstanding loans which are still held by guaranty agencies." According to ECMC, the debtor defaulted on the ECMC loan on or about April 30, 2005, leaving a total indebtedness of $16,354.02 as of March 20, 2006.

On March 13, 2006, ECMC's attorney sent the debtor's attorney a letter discussing the William D. Ford Income Contingent Repayment Program ("ICRP"). ECMC's attorney also attached an application for the ICRP program. The ICRP program is succinctly summarized as follows:

> The [ICRP] permits a student loan debtor to pay twenty percent of the difference between his adjusted gross income and the poverty level for his family size, or the amount the debtor would pay if the debt were repaid in twelve years, whichever is less. Under the program, the borrower's monthly repayment amount is adjusted each year to reflect any changes in these factors. The borrower's repayments may also be adjusted during the year based on special circumstances. *See* 34 C.F.R. § 685.209(c)(3). At the end of the twenty five year payment period, any remaining loan balance would be cancelled by the Secretary of Education.

*Korhonen v. Educational Credit Mgmt. Corp. (In re Korhonen)*, 296 B.R. 492, 496 (Bankr. D. Minn. 2003). *See also* 34 C.F.R. § 685.209. The defendants argue that based on the above formula, the debtor would owe $0 per month unless his income increased; thus, the debtor could potentially pay nothing for 25 years and still receive a complete discharge of his student loan debts. Interest will continue to accrue on the loan amount until it is "cancelled" or discharged.

---

[3]This figure was also stipulated by all parties at this Court's September 19 hearing.

Case 05-01149   Doc 31   Filed 10/03/06   Entered 10/03/06 14:39:23   Desc Main
Document      Page 5 of 23

34 C.F.R. § 685.209(c)(5).  The debtor never attempted to participate in the ICRP program.

The defendants also sent the debtor an application for a loan discharge based on a finding of total and permanent disability ("TPD").  The TPD program is described as follows:

> (a) General.  (1) If the Secretary makes an initial determination that a borrower is totally and permanently disabled, the Secretary –
>
> (i) Notifies the borrower that the loan will be in a conditional discharge status for up to three years from the date that the borrower became totally and permanently disabled . . . .
>
> (ii) Suspends any efforts to collect on the loan from the date of the initial determination described in paragraph (a)(1) of this section until the end of the conditional discharge period.
>
> (2) If the borrower continues to meet the eligibility requirements for total and permanent disability discharge during and at the end of the three-year conditional discharge period, the Secretary –
>
> (i) Discharges the obligation of the borrower and any endorser to make any further payments on the loan at the end of that period . . . .

34 C.F.R. § 685.213.  The debtor claims that the TPD program will not accept the SSA's evaluation of him as totally and permanently disabled; instead, the TPD program requires a physician's diagnosis that he is totally and permanently disabled.  The debtor says that he cannot afford to consult a physician.  Therefore, the debtor also did not pursue the TPD program.

On April 7, 2006, ECMC filed a motion for summary judgment with this Court, requesting the Court to "enter summary judgment in favor of ECMC holding that the [ECMC loan is] nondischargeable."  In support of its motion, ECMC noted that the debtor could participate in the ICRP and be "eligible for deferments and forbearances."  ECMC also attached an affidavit of one its employees, whereby the employee swore that a TPD application was sent

to the debtor but never returned. In an order signed May 11, 2006, this Court granted partial summary judgment to ECMC, finding that (1) it was the type of entity that was contemplated under 11 U.S.C. § 523(a)(8); (2) the debtor executed a promissory note on or about October 21, 1994, in the amount of $6,650 for educational purposes; (3) debtor defaulted on the promissory note on or about April 30, 2005; and (4) the balance on the promissory note as of March 20, 2006, was $16,354.02.

This Court held a hearing on the matter on September 19, 2006. At the hearing, both ECMC and the Department of Education ("defendants") argued that these student loan debts are nondischargeable because the debtor failed to pursue available administrative remedies prior to seeking a discharge of his student loan debts in bankruptcy. Both parties also argue that debtor failed to exhibit good faith by accepting loans disbursed to him after he experienced the medical problems that caused him to leave school.

## LAW

The debtor filed a complaint with this Court on September 20, 2005, seeking to discharge his student loans pursuant to 11 U.S.C. § 523(a)(8). That section was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), with an effective date of October 17, 2005. Since the amendment to 11 U.S.C. § 523(a)(8) did not become effective until approximately one month after the debtor filed this complaint, it does not apply to this proceeding.[4]

---

[4]Besides adding that a debtor must prove undue hardship to discharge "any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[,]" the amended version of 11 U.S.C. § 523(a)(8) essentially mirrors the language used in its pre-BAPCPA state.

Prior to October 17, 2005, 11 U.S.C. § 523(a)(8) provided:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -
> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents . . . .

In the Eleventh Circuit, an analysis of undue hardship is determined under the three-pronged test developed in *Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987). Hemar Ins. Corp. of Am. v. Cox (In re Cox)*, 338 F.3d 1238, 1241 (11th Cir. 2003). To prove undue hardship, the debtor must show

> (1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id*. quoting *Brunner*, 831 F.2d at 396. The plaintiff has the burden of proving all three prongs of the test by a preponderance of the evidence. *Southard v. Educational Credit Mgmt. Corp. (In re Southard)*, 337 B.R. 416, 420 (Bankr. M.D. Fla. 2006). "If one of the elements of the test is not proven, the inquiry ends, and the student loan cannot be discharged." *Id*. In this case, the Court, in its September 19 hearing, orally found the first and second prongs of the *Brunner* test satisfied. The findings and conclusions about these prongs made on the record at the hearing are incorporated by reference. After observing the debtor while he was in Court, reviewing the

8

written evidence, and hearing the testimony of Mr. Ross and his brother, this Court concluded that he was physically disabled, he would not recover from his physical disabilities, and he was living at a minimal financial level. This opinion will focus solely on the third prong.

It is true that a debtor's participation or non-participation in an administrative repayment program is at least a factor in determining whether the good faith prong of the *Brunner* test has been met. *See Brosnan v. American Educ. Servs. (In re Brosnan)*, 323 B.R. 533, 538 (Bankr. M.D. Fla. 2005) *quoting United States Dept. of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 185 (C.D. Cal. 2000) ("A factor the Court must consider when determining whether Plaintiff exhibited good faith when seeking discharge of her student loans is her 'effort – or lack thereof – to negotiate a repayment plan.'"); *Rutherford v. William D. Ford Loan Program (In re Rutherford)*, 317 B.R. 865, 881 (Bankr. N.D. Ala. 2004) ("The ICRP is one factor to consider in deciding the dischargeability of student loans."); *Nanton-Marie v. United States Dept. of Educ. (In re Nanton-Marie)*, 303 B.R. 228, 236 (Bankr. S.D. Fla. 2003) *quoting In re Korhonen*, 296 B.R. at 496 ("[P]articipation, or non-participation as the case may be, 'is but one factor to be considered in determining undue hardship . . . . '"). The defendants appear to argue that failure to pursue such administrative remedies prior to seeking bankruptcy relief should lead to an automatic denial of discharge. *See In re Brosnan*, 323 B.R. at 538-39 (denying discharge of student loans because plaintiff "did not seek a loan discharge due to total and permanent disability" nor attempt "to negotiate her payment schedule"). However, "there is no section of the Bankruptcy Code that requires it as a condition precedent to an undue hardship discharge." *In re Nanton-Marie*, 303 B.R. at 235. In fact, it "'is but one factor to be considered in determining undue hardship[;] it is not determinative.'" *Id*. at 236 *quoting In re Korhonen*, 296

9

B.R. at 496. Nonetheless, the defendants cite to four cases in support of their argument.

The first case defendants cite is a bankruptcy court opinion from the Eighth Circuit. *See Furrow v. United States Dept. of Educ. (In re Furrow)*, 2005 WL 1397156 (Bankr. W.D. Mo. May 24, 2005). In that case, the debtor applied for a total and permanent disability discharge of her student loans. *Id*. at *1. She was found eligible for a conditional disability discharge and placed in such status. *Id*. Subsequently, the debtor filed bankruptcy and sought a discharge of her student loan debts. *Id*. The court began its opinion by noting that "[p]laintiff must exhaust all administrative remedies and rights provided to her prior to this Court determining whether hardship, as defined by § 523(a)(8), exists on the evidence presented." *Id*. Since the debtor in the *In re Furrow* case could potentially receive a discharge of her student loan debts under her conditional disability discharge status, the court found that the issue was not yet ripe for review. *See id*. "Any determination that the Court may make at this juncture regarding Debtors' hardship discharge would be purely hypothetical and speculative given the fact that there may be no debt to be discharged under § 523(a)(8) at the end of the three-year period." *Id*. at *2. The court continued by stating that if the debtor did not receive her disability discharge through administrative avenues, then she could ask the court to reopen her case in the future. *Id*.

This Court respectfully disagrees with the above reasoning. First of all, this Court concludes that an adversary proceeding regarding the dischargeable or nondischargeable nature of a student loan is an issue that is ripe for review in this case despite the debtor's failure to exhaust administrative avenues. As the *In re Furrow* court recognizes, "[t]here are two factors relevant to a ripeness decision: the fitness of the issue for judicial resolution and the hardship to the parties of withholding court consideration." *Id*. "The first factor of 'fitness for judicial

10

resolution' generally 'safeguards against judicial review of hypothetical or speculative

disagreements.'" *Id. quoting Nebraska Public Power Dist. v. MidAmerican Energy Co.*, 234 F.3d

1032, 1038 (8th Cir. 2000). "The second factor of 'hardship to the parties' involves a

determination that delayed review will result in significant harm, with 'harm' including both the

traditional concept of damages and also the heightened uncertainty and resulting behavior

modification that may result." *Id*.

In regard to the "fitness for judicial resolution" inquiry, this Court concludes that, despite

the fact other administrative avenues may be available to Mr. Ross, a determination as to the

dischargeable nature of his student loan is neither hypothetical nor speculative. This is so

because the existence of such administrative plans "'cannot trump the Congressionally mandated

individualized determination of undue hardship.'" *In re Nanton-Marie*, 303 B.R. at 235-36

*quoting In re Korhonen*, 296 B.R. at 496. *See also Educational Credit Mgmt. Corp. v. Barrett*

*(In re Barrett)*, 337 B.R. 896, 903 (B.A.P. 6th Cir. 2006) ("ECMC takes the position that the

Debtor cannot prove that he has made good faith efforts to repay his student loans unless he

agrees to participate in the ICRP. Adoption of ECMC's position would effectively eliminate the

discharge of student loans for undue hardship from the Bankruptcy Code. The Panel does not

believe that this is the result intended by Congress.").

In regard to the "hardship to the parties" inquiry, this Court does find that failure to

decide the issue will lead to hardship in this case. If Mr. Ross enters into an administrative

repayment plan in lieu of completing this bankruptcy and subsequently fails to seek an

administrative discharge, his recourse, as the *In re Furrow* case suggests, is to file a motion with

the Court to reopen his case and seek a court-imposed discharge. However, the *In re Furrow*

court is asking Mr. Ross, who is a poverty-level, unsophisticated, and disabled debtor, to pay for

a trial after spending time and money exhausting administrative remedies. The cost and the time

required will be prohibitive for Mr. Ross, who has no hope of recovery or future employment.

Even assuming that Mr. Ross remains in the administrative program for its entirety, he is

nonetheless presently harmed since such programs "'eliminat[e] or severely curtail[] the debtor's

ability to incur credit in an increasingly credit driven economy.'" *In re Nanton-Marie*, 303 B.R.

at 236 *quoting In re Korhonen*, 296 B.R. at 497. This Court views all of the above as immediate

harm to this debtor. Therefore, the current issue is ripe for review.

Although the above *In re Furrow* proceeding involved the TPD administrative repayment

option, the same court, in a prior proceeding, denied the government's summary judgment

motion seeking dismissal on the ground that the debtor could participate in the ICRP program.

*Furrow v. United States Dept. of Educ. (In re Furrow)*, 2004 WL 2238536 (Bankr. W.D. Mo.

Sept. 28, 2004). In that proceeding, the court noted:

> [T]he availiability of the ICRP is but one of the factors for the
> Court to consider in determining whether excepting the debt from
> discharge would impose an undue hardship on the Debtor. [F]or
> this Court to simply delegate to the Department of Education the
> determination of what Plaintiff can afford to pay on her student
> loan would be to abdicate the responsibility given it by Congress to
> make the determination of undue hardship. *See, e.g., Limkemann
> v. U.S. Department of Education*, 2004 WL 2032375, *4
> (Bankr.N.D.Iowa 2004) ("A significant problem in the
> [Department's] argument is that requiring a bankrupt debtor to
> participate in the ICRP whenever eligible in lieu of receiving a
> discharge deprives the bankruptcy court of its role in determining
> undue hardship."); *see also*, *In re Durrani*, 311 B.R. 496, 508-09
> (Bankr.N.D.Ill.2004) (substituting the ICRP for the "thoughtful and
> considered exercise" of the court's discretion would convert an
> undue hardship inquiry into a "rote and meaningless exercise"); *see
> also*, *In re Korhonen*, 296 B.R. 492, 496 (Bankr.D.Minn.2003)

("The [ICRP] cannot trump the Congressionally mandated individualized determination of undue hardship."); *In re Johnson*, 299 B.R. 676, 682 (Bankr.M.D.Ga.2003) ("If Congress had intended the question of dischargeability of student loans to be delegated to a nonjudicial entity, no matter how fair its formulas and intentions may appear, it could have provided for such."); *Newman v. ECMC*, 304 B.R. 188 (Bankr.E.D.Pa.2002) (stating unaware of any decision holding the availability of the ICRP by itself requires a finding that it would not be an undue hardship to repay student loan obligation).

*Id*. at *3. In the 2005 proceeding, the *In re Furrow* court distinguished its finding in regard to the ICRP program and its finding in regard to the TPD program:

> Plaintiff argues that the Department seeking dismissal of this adversary proceeding due to its conditional discharge is similar to the Department seeking summary judgment because of the existence of the [ICRP]. In ruling on the Department's motion for summary judgment regarding the ICRP, this Court stated that it would not simply delegate to the Department the determination of what Plaintiff can afford to pay on her student loan as that would abdicate the responsibility given to this Court by Congress to make the determination of undue hardship. However, the situation at issue now is distinguishable from the one that faced the Court on the motion for summary judgement. In that situation, Plaintiff would not have had the ability to return to this Court to seek its determination of dischargeability of her student loan due to undue hardship. Rather, the Department's decision under the ICRP would have determined the undue hardship issue. Conversely, in the situation at hand, the Department has granted Plaintiff a conditional disability discharge under its own administrative guidelines. However, if that discharge does not become permanent or total at the end of the requisite three-year period, Plaintiff still has the ability to return to this Court to seek a judicial determination on the dischargeability of her student loan. Thus, no harm or prejudice to the Plaintiff will result and the Court is not abdicating its responsibility to determine the dischargeability of Plaintiff's student loan if such determination becomes necessary.

*In re Furrow*, 2005 WL 1397156 at *2. This Court fails to see the distinction the *In re Furrow* court makes between the ICRP program and the TPD program. In fact, this Court views a

13

bankruptcy court's dismissal of a student loan dischargeability proceeding based exclusively on the availability of alternative administrative repayment plans as "abdicat[ing] the responsibility given it by Congress to make the determination of undue hardship." *Id.* As such, the Court does not find the *In re Furrow* court's distinction persuasive.

The next two cases cited by defendants come from an Eleventh Circuit bankruptcy court and another Eighth Circuit bankruptcy court. *See Folsom v. United States Dept. of Educ. (In re Folsom)*, 315 B.R. 161 (Bankr. M.D. Fla. 2004); *Vermaas v. Student Loans of North Dakota (In re Vermaas)*, 302 B.R. 650 (Bankr. D. Neb. 2003). In *In re Folsom*, the court, in dicta, found that the debtor would have failed the good faith prong of the *Brunner* test because "[p]laintiff made only two payments of $38.07 on her student loans even though she earned over $24,000 during 2001 [and] Plaintiff did not seek a loan discharge due to total and permanent disability . . . prior to seeking a discharge in this Court." 315 B.R. at 165-66. The court's determination that the good faith prong would not have been met does not appear to hinge exclusively on the fact that the debtor failed to seek an administrative disability discharge. Instead, the court also appeared to take into account the fact that the debtor failed to pay more money toward her student loan debt than a $24,000 per year salary would allow. *See id.* In this case, Mr. Ross also did not complete and deliver a TPD application; however, he never made $24,000 per year since his student loans were received. Instead, Mr. Ross lives off of $835 a month in social security disability benefits as well as whatever help his brother can provide. Despite this minimal income, Mr. Ross testified that he tried to pay off some of the student loans two years ago, but he stopped because he couldn't afford it anymore. Thus, this Court finds the facts of this debtor's case to be distinguishable from the debtor's in *In re Folsom*.

14

In *In re Vermaas*, a married couple sought to discharge their individual student loan debts. 302 B.R. at 653-54. The debtor-husband suffered from physical and mental problems that left him "a non-functioning individual relying upon his wife for support . . . . " *Id*. at 655. He was not found "to be totally disabled by the Social Security Administration . . . . " *Id*. Nonetheless, the debtor-husband still obtained his degree with the help of the student loans in question. *Id*. At the time of this bankruptcy proceeding, the debtor-husband never made a payment, did not seek to participate in the ICRP program, and didn't seek an administrative discharge upon a finding of total and permanent disability. *Id*. The court denied the debtor-husband's discharge based on the following reasoning:

> [T]he fact that he was physically, mentally, and emotionally capable of obtaining an associate of arts degree is an indication that he is able to fill out the appropriate forms to give the student loan program the opportunity to review and analyze his situation under the appropriate regulations. His failure to take such action is a relevant fact and circumstance that this court must consider and that this court has considered. Although it does appear that he has no current income and very little likelihood of future income, the Bankruptcy Code student loan hardship discharge should not be granted unless the student loan debtor has exhausted his administrative remedies under the student loan program. Even though it is unlikely that the program can ever obtain payments from [the debtor-husband] because he has no income and no assets, the program administrators have the right to the opportunity to evaluate his financial circumstances and apply their regulatory procedures. Unless a debtor provides the program with sufficient information to apply its administrative procedures, there is no legal or factual basis for granting a hardship discharge under the Bankruptcy Code.

*Id*. at 660.

The facts of Mr. Ross's case can be distinguished. The *In re Vermaas* court seems to base its holding on the fact that since the debtor-husband was "physically, mentally, and

15

emotionally capable" of completing his education, then he certainly had the capacity to fill out the appropriate forms and give the lender an opportunity to review other repayment options. Mr. Ross, however, did not finish his education because he fell on his head and cracked his spine while he was going to school. The effect of Mr. Ross's injuries hindered him from living an independent life, much less from obtaining his degree. Contrary to the debtor-husband in *In re Vermaas*, Mr. Ross has been found to be disabled by the SSA. As testified to at trial by Mr. Ross and his brother, the debtor suffers from numerous physical ailments and memory loss. As such, the debtor does not have the ability that Vermaas had to fill out the administrative forms, much less remember what information to include on the forms. Based on these distinguishing facts, the Court also fails to find the *In re Vermaas* case persuasive.

The last case cited by defendants comes from an Eleventh Circuit District Court. *See Educational Credit Mgmt. Corp. v. Boykin (In re Boykin)*, 313 B.R. 516 (M.D. Ga. 2004). In that case, a married couple sought to discharge their student loan debts. *Id*. at 518. The debtor-husband suffered from a learning disability but was not physically disabled. *Id*. In fact, he had two part-time jobs. *Id*. at 519. The debtor-wife suffered from a degenerative disc disease but was still able to work 32 hours per week as an optical assistant. *Id*. at 518-19. Their combined monthly income was approximately $2,038, and their combined monthly expenses were approximately $2,175. *Id*. at 519. The debtors took out a total of twelve loans, eight of which were held by two creditors. *Id*. at 518. In regard to these eight loans, the debtors negotiated a settlement with the two creditors, thereby reducing their indebtedness and agreeing to participate in the ICRP program. *Id*. The remaining four loans, held by ECMC, were the subject of this proceeding. *Id*. At the time of this proceeding, the debtors had not made a payment on this

16

student loan debt. *Id*. at 519. In finding that the good faith prong of the *Brunner* test had not been met, the court first noted that debtors must show that they are "'making efforts to satisfy the debt by all means – or at least [by] *some* means – within the debtor's reasonable control.'" *Id*. at 523 *quoting Ulm v. Educational Credit Mgmt. Corp.*, 304 B.R. 915, 922 (S.D. Ga. 2004). The court found that since the debtors had already entered the ICRP program, and since the inclusion of ECMC's debt into the program would not increase their monthly payments, the debtors failed to "fully explore[], in good faith, all means of repayment that are reasonably within their control." *Id*.

Mr. Ross's case, however, is distinguishable. Whereas the Boykins never made a payment, Mr. Ross did make payments in the past and had some tax refunds taken by the IRS to pay off his student loan debt. Mr. Ross also considered the TPD program but decided that he could not afford to pursue this administrative remedy because of the program's requirement that he present them with a physician's diagnosis regarding his disability. Mr. Ross states that he could not afford to consult a physician in order to provide the appropriate paperwork. Moreover, unlike the Boykins, Mr. Ross is disabled to the point where he cannot acquire or hold a job. The Boykins did work and appeared to have the ability to continue working; in the future, they may be able to earn enough to make some repayment on their loans. Mr. Ross, on the other hand, only has his social security disability benefits in the future. Furthermore, the Boykins had already entered the ICRP program with two creditors, whereas Mr. Ross has not; it appears to this Court that this factor weighed heavily in the District Court's decision. Therefore, the *In re Boykin* decision fails to persuade this Court.

This Court finds another factor important in reaching its conclusion that Mr. Ross's

17

failure to utilize administrative repayment options prior to filing for bankruptcy does not preclude a finding of good faith under the third prong of *Brunner*. Although a debtor that participates in the ICRP may never have to make payment under the program, a debtor may nonetheless have to pay taxes on the loan that is discharged 25 years later. *See Coatney v. United States Dept. of Educ. (In re Coatney)*, 345 B.R. 905, 910-11 (Bankr. C.D. Ill. 2006) (discussing its concern "that the Debtor could face a huge tax liability for imputed income [after] the termination of his ICRP payment period"); *Allen v. American Educ. Servs. (In re Allen)*, 324 B.R. 278, 281-82 (Bankr. W.D. Pa. 2005) ("[I]t is not necessarily the case that each and every debtor will benefit from . . . the [ICRP] – indeed, some debtors would most likely suffer were they to take advantage of the [ICRP. A] debtor, by entering into a repayment plan under the [ICRP], may potentially incur, after the 25 -year repayment term called for under the [ICRP], a substantial, ultimately nondischargeable, tax obligation as a result of the discharge of that portion of his or her student loan debt that ultimately is not repaid under such repayment plan."); *Williams v. Educational Credit Mgmt. Corp. (In re Williams)*, 301 B.R. 62, 79 (Bankr. N.D. Cal. 2003) ("Twenty-five years from now, . . . forgiveness of any balances that were not paid under the Ford Program [may] constitute taxable income . . . . "). After 25 years, Mr. Ross will be discharged of his debts under the ICRP program. Even though he will not presently have to pay any money towards his student loan debt, and since he is unlikely to be able to pay any of this debt in the future, his debt will continue to increase. After 25 years, he will be discharged of a substantial amount of debt, leaving him with a potential tax liability of thousands of dollars at the age of 67.

  This Court is aware that an Eleventh Circuit District Court observed the potential tax

liability that may result to debtors after a discharge of their debts under the ICRP program, yet dismissed it by stating that "[f]orecasting such a tax liability under whatever tax laws will be in effect in 25 years would be sheer speculation." *Educational Credit Mgmt. Corp. v. Stanley*, 300 B.R. 813, 819 n.8 (N.D. Fla. 2003). However, this Court respectfully disagrees that assuming such a tax liability in the future will amount to "sheer speculation". Instead, the Court believes that "it would be complete speculation to consider what the law might possibly be far in the future, whereas [the debtor's] decision about whether to enter the [ICRP or TPD programs has] to be made in the present." *In re Williams*, 301 B.R. at 79. Therefore, the Court will consider the law as it stands today instead of speculating as to what it may be in the future.

26 U.S.C. § 61(a)(12) provides that "[e]xcept as otherwise provided in this subtitle[,] gross income means all income from whatever source derived, including (but not limited to) . . . [i]ncome from discharge of indebtedness . . . ." 26 U.S.C. § 108(a)(1)(B) provides that "[g]ross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if . . . the discharge occurs when the taxpayer is insolvent . . . ." "Insolvent" is defined as "having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due." BLACK'S LAW DICTIONARY 812 (8th ed. 2004). Per this definition, Mr. Ross is already insolvent since he has liabilities that exceed the value of his assets and he cannot pay debts as they fall due. Both Mr. Ross and his brother testified that the debtor cannot afford to pay for all of his medications some months and the debtor cannot afford to pay his utility bills some months. Since the debtor is already insolvent and will more than likely continue to be so after 25 years, 26 U.S.C. § 108(a)(1)(B) appears to

19

provide that Mr. Ross will not be taxed on any of the debt that is discharged. However, 26 U.S.C. § 108(a)(3) provides that "[i]n the case of a discharge to which [26 U.S.C. § 108(a)(1)(B)] applies, the amount excluded under [such section] shall not exceed the amount by which the taxpayer is insolvent." Therefore, this section helps clarify that Mr. Ross will only be relieved of tax liability in an amount equal to his insolvency.

The debtor has a student loan indebtedness on the DOE loan of $9,692.22 (excluding interest) as of October 25, 2005. Interest accrues on this debt in the amount of $1.36 per day. The debtor also owes $16,354.02 on the ECMC loan as of March 20, 2006. Interest accrues on this debt at a variable rate of 6.1% per annum. If the debtor were to utilize the ICRP program, the total interest charged against his DOE loan at the end of 25 years will be approximately $12,410. The total interest charged against his ECMC loan, assuming that the variable rate remains at 6.1% and that the interest is not capitalized, will be approximately $24,939.88, which is approximately $8,585.86 more than the debtor's present indebtedness. At the end of 25 years, the debtor's total debt will be approximately $63,396.12.

An argument can be made that since the debtor is currently insolvent and will more than likely continue to be so, the tax laws will not treat the debt that is discharged after 25 years as gross income. *See* 26 U.S.C. §§ 108(a)(1)(B) & (a)(3). However, this Court finds such an argument to be "sheer speculation" since no one can predict the future circumstances of an individual debtor such as Mr. Ross. For all the Court knows, Mr. Ross may inherit money from his brother, thus lifting the debtor from his "insolvent" state and causing his discharged debt to be taxable as gross income. An even more likely, yet still speculative, scenario may be that Mr. Ross's daughters help lift their father from his "insolvent" state, thus leading to the same result.

Again, this Court believes that "it would be complete speculation to consider what the [facts and law] might possibly be far in the future, whereas [the debtor's] decision about whether to enter the [ICRP or TPD programs has] to be made in the present." *In re Williams*, 301 B.R. at 79. Therefore, the Court will base its decision on the current state of bankruptcy law.

"[T]he public policy of the Bankruptcy Code is to balance the interests of debtors and creditors. Specifically, the Code balances the debtor['s] 'fresh start' against the creditor['s] effort to be paid its claim." *Colwell v. Royal Int'l Trading Corp. (In re Colwell)*, 226 B.R. 714, 721 (S.D. Fla. 1998); *In re Snape*, 172 B.R. 361, 364 (Bankr. M.D. Fla. 1994). *See Etheridge v. Illinois*, 127 B.R. 421, 421 (C.D. Ill. 1989) ("The Bankruptcy Code attempts to balance the debtor's interest in a fresh start with creditors' interest in maximizing both the pool of assets and their individual recoveries."). Although "[t]he Code is intended to provide an honest but unfortunate debtor with a fresh start, . . . it is also designed to safeguard creditors['] interests in obtaining repayment when repayment is not a burden on the debtor." *In re Morse*, 164 B.R. 651, 656 (Bankr. E.D. Wash. 1994). When this Court balances the two competing goals of the Bankruptcy Code, the scales weigh in Mr. Ross's favor.

On one side of the scale, the defendant creditors seek repayment of student loans they disbursed to Mr. Ross. The defendants recognize that under the ICRP program, Mr. Ross will currently pay them $0 per month. Defendants further recognize that Mr. Ross will pay little, if anything, towards this indebtedness during the term of the ICRP program. Therefore, the defendant creditors will spend money and time keeping track of the debtor's loan records for 25 years.

On the other side of the scale, Mr. Ross's income constitutes approximately $10,020 per

21

year in social security disability benefits, whereas his student loan indebtedness is in excess of $25,000 and still accumulating interest. The debtor currently has trouble paying his current monthly expenses, which expenses the Court finds both necessary and not, by any stretch of the imagination, excessive. When all factors are considered, the Court finds that the defendant creditors expect little, if anything, to be paid under the ICRP program; therefore, the policy of protecting creditors' claims is not as strong in this case as it may be in others. On the other hand, Mr. Ross can derive no benefit under the ICRP program, yet may experience a detriment by having to pay taxes on the debt that is discharged after 25 years. Therefore, since the creditors appear to have little, if any benefit, and since the debtor has only a detriment to look forward to, the Court finds that the policy of giving this debtor a "fresh start" outweighs the policy of "safeguarding creditors" in this particular case.[5]

Another factor that the Court may take into consideration in determining undue hardship is the age of the debtor. *Fahrer v. Sallie Mae Servicing Corp. (In re Fahrer)*, 308 B.R. 27, 35 (Bankr. W.D. Mo. 2004).[6] At the completion of the ICRP program, Mr. Ross will be approximately 67 years old. To compel a retirement-age disabled debtor such as Mr. Ross to face a high potential tax liability after 25 years would pose an "undue hardship".

In regard to the TPD program, this Court has found no cases discussing the potential tax

---

[5]"Where there is no reasonable likelihood that the Debtor will ever be able to repay his student loans, the ICRP fails to provide a reasonable alternative to a discharge for undue hardship." *In re Barrett*, 337 B.R. at 904.

[6]Although the court in *In re Fahrer* uses the totality of the circumstances test instead of the *Brunner* test, this Court still finds age to be a factor under the *Brunner* test. *See In re Nanton-Marie*, 303 B.R. at 235 (taking into consideration that the debtor will be 82 years old at the completion of the ICRP program). However, this Court does not agree with *In re Fahrer* to the extent that it says that age is a determinative factor.

22

liabilities debtors may face after a discharge of their debts under such program.  However, since a debtor's student loans will be discharged at the end of the program, much like the ICRP, the Court sees no reason why a discharge of debt under the TPD program would yield a different result than under the ICRP program.  Therefore, should the debtor undertake the TPD administrative program, the student loan indebtedness that will potentially be discharged after three years may be included in his gross income and taxed.

The Court finds that even though the ICRP and TPD programs may be a good option for some debtors, participation in either program will pose an "undue hardship" for Mr. Ross.  The Court reaches this conclusion despite the defendants' contention that Mr. Ross exhibited bad faith by accepting loans after he suffered some of his injuries.  He hoped to remedy his situation with medication.  When a debtor is totally and permanently disabled at the time of a trial where the dischargeability of student loan debts is at issue, the Court will not require the debtor to exhaust all administrative remedies as a precondition to a finding that the debtor "has made good faith efforts to repay" his or her student loans.  Such a requirement forces a debtor like Mr. Ross to expend scarce resources and energy on questionably useful activities.  The potential tax burden on a totally and permanently disabled individual is also inappropriate.

THEREFORE IT IS ORDERED AND ADJUDGED:

1)      The plaintiff's student loan debts are DISCHARGED.


Dated:   October 3, 2006



_Margaret A. Mahoney_
MARGARET A. MAHONEY
U.S.  BANKRUPTCY JUDGE

23